FILED
8TH JUDICIAL DISTRICT COURT
COLFAX COUNTY NM
FILED IN MY OFFICE
1/9/2023 12:29 PM
LAUREN M. FELTS-SALAZAR
DISTRICT COURT CLERK
Lisa Ortega

**EIGHTH JUDICIAL DISTRICT**
**COUNTY OF COLFAX**
**STATE OF NEW MEXICO**

**FABIAN MASCAREÑAS,**

      Plaintiff,

    v.                    **Case No. D-809-CV-2021-00148**

**VILLAGE OF ANGEL FIRE, NEW**
**MEXICO and The HONORABLE**
**JO MIXON, Mayor,**

      Defendants.

---

### FIRST AMENDED COMPLAINT BASED ON VIOLATION OF THE NEW MEXICO WHISTLEBLOWER PROTECTION ACT, THE FRAUD AGAINST TAXPAYERS ACT, AND 42 U.S.C. § 1983

COMES NOW, Plaintiff Fabian Mascareñas ("Plaintiff"), by and through his attorneys, Linda G. Hemphill and Leigh Messerer, Hemphill & Messerer, P.C. and Trevor T. Moore, Esq., and for his First Amended Complaint against defendants Village of Angel Fire, New Mexico (the "Village"), and the Honorable Jo Mixon, Mayor of the Village of Angel Fire ("Mayor Mixon")(collectively "Defendants") and for his First Amended Complaint Based on Violation of the New Mexico Whistleblower Protection Act, the Fraud Against Taxpayers Act, and 42 U.S.C. § 1983, states as follows:

### INTRODUCTION

From June 16, 2015, until August 28, 2021, Plaintiff served as the Chief Procurement Officer for the Village. Following the municipal elections in November 2019, a new administration took office, including newly-elected Mayor Mixon and three village councilors. As one of her first acts in office, Mayor Mixon appointed Jay Mitchell ("Mitchell") to serve as the new Village Manager.

1

> EXHIBIT
> A

Over the next several months, perhaps harkening back to his days overseeing the financial dysfunction at the New Mexico Department of Homeland Security and Emergency Management, Mitchell saw to it that the finance and procurement policies of the Village were completely revamped. The hallmark of this new system was a complete disregard for the requirements of the New Mexico Procurement Code, NMSA 1978, §§ 13-1-28 et seq. (2020) (the "Procurement Code") and the New Mexico Governmental Conduct Act, NMSA 1978, §§ 10-16-1 et seq. (2020) (the "Governmental Conduct Act"), usurpation of Plaintiff in his role as Chief Procurement Officer and a pattern of conduct—condoned and facilitated by others in the administration, including its elected head—that would eventually see millions of taxpayer dollars squandered through fraud, waste and abuse.

Chief among those responsible for dismantling the previous system of financial controls was Mitchell, who, over the course of a year and a half, assumed the role of the self-appointed and unimpeachable procurement czar. With the authority vested in him by Mayor Mixon, and the oversight of an aloof Village Council, Mitchell embarked on a management-sponsored reign of terror, usurping the authority of Plaintiff as the legitimate head of procurement to force the authorization of one prohibited purchasing transaction after another—each of which, only after exhaustive lawful efforts to ensure compliance, Plaintiff approved under protest.

Following an executive session of the regular meeting of the Village Council held on June 8, 2021, the Village Council voted to terminate Mitchell's employment. Although Councilor Billingsley indicated that Mitchell was being terminated without cause under the terms of his employment agreement, Mayor Mixon later confirmed, during a Village staff meeting held the week of June 15, 2021, that Mitchell had been terminated on the grounds that he had created a hostile work environment.

Notwithstanding the Mitchell's subsequent replacement as Village Manager by Terry Cordova, Village procurement activities continued to be conducted without regard to the requirements of the Procurement Code and the Governmental Conduct Act, and over the explicit objections of the Plaintiff, whose role as Chief Procurement Officer had by now been completely eviscerated. This pattern of fraud, waste and abuse remained consistent during Plaintiff's tenure, the remaining Village leaders either unable or unwilling to stop it.

Plaintiff, for his lawful efforts in attempting to uphold and maintain a system of financial and procurement controls consistent with applicable law, was cast out. He became the focus of management scorn. From being the only one not invited to Village Hall parties to being the only one not to receive a promised raise. Ultimately, Plaintiff felt that he had only two choices, as far as the Village was concerned: either play along or resign and forego retirement benefits. When he instead chose to file a complaint with the New Mexico Office of the State Auditor, his fate was sealed. On August 28, 2021, Mayor Mixon demoted Plaintiff, fundamentally altering the nature of his role and stripping him of all supervisory responsibilities, without affording him due process of law, as required by the village code of the Village of Angel Fire, New Mexico (the "Village Code") and the Fourteenth Amendment to the United States Constitution. Because no reasonable person could be expected to endure the ongoing circumstances of his employment, Plaintiff was constructively discharged from employment on August 31, 2021. He seeks compensatory damages stemming from the hostile work environment he endured, his wrongful demotion and his constructive discharge, and punitive damages as allowed by law.

## PARTIES

1.     Plaintiff Fabian Mascareñas was employed by the Village from June 16, 2015, until August 31, 2021, serving all but the last few days of his tenure as the Chief Procurement Officer,

reporting to the Village Manager. As Chief Procurement Officer, Plaintiff had full-time responsibility for the following:

a.  Establishing and maintaining a Central Purchasing System of integrity and transparency;

b.  Overseeing and supervising employees and all activities of the purchasing department;

c.  Preparing plans for the purchase of equipment, services and supplies;

d.  Following and enforcing the Village's procurement policies and procedures;

e.  Reviewing, comparing, analyzing and approving products and services;

f.  Maintaining good supplier relations and negotiating contracts;

g.  Researching and evaluating prospective suppliers;

h.  Preparing cost analyses and reports;

i.  Overseeing grant funding, compliance and execution to include coordinating amongst all parties of Village projects from inception to completion;

j.  Tracking project contracts, cost and timelines to ensure on-schedule completion, and adherence to scope and budget;

k.  Coordinating with Village legal counsel for contract compliance;

l.  Administering all stages of the grant process, including receiving, assessing, tracking, payment requests, documentation of inquiries and proposals, ensuring compliance with legal requirements and record-keeping;

m.  Maintaining the online non-profit database and ensuring data accuracy and integrity;

n.  Overseeing standard terms and conditions for grant award and agreements; and

4

  o. Complying with required research pertinent to grant due diligence, ongoing review and closeout analyses.

2. Plaintiff was, at all relevant times, a "public employee" as defined by the New Mexico Whistleblower Protection Act, NMSA 1978, §§ 10-16C-1 et seq. ("WPA") at § 10-16C-2(B).

3. Defendant Village of Angel Fire (the "Village") is a municipality located in Colfax County in the State of New Mexico and is a "public employer" as defined by § 10-16C-2(C)(2) of the WPA.

4. The Village is also a public employer under the New Mexico Fraud Against Taxpayers Act (NMSA 1978, §§ 44-9-1 et seq.) ("FATA") at § 44-9-2B.

5. Defendant the Honorable Jo Mixon ("Mayor Mixon") is the mayor of the Village of Angel Fire and, upon information and belief, resides in Colfax County. At all times material hereto, Mayor Mixon was acting within the course and scope of her employment and under color of state law.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action.

7. Venue is proper in this Court under NMSA 1978, §§ 38-3-1(A) and 38-3-2.

## FACTS

**A. Plaintiff's Background**

8. Plaintiff incorporates and re-alleges all of the allegations at ¶¶ 1-2, above.

**B. Fraud, Waste and Abuse and Plaintiff's Attempts to Enforce Compliance**

9. Improper Use of New Mexico Fire Protection Fund Proceeds. In March 2020, former Village Fire Chief, John Murtagh, sent his son John Murtagh Jr. to attend an aircraft rescue

firefighter training course hosted by the South Carolina Fire Academy. The training and travel expenses, totaling $1,009, were funded by the Village using proceeds from the New Mexico Fire Protection Fund. Plaintiff discussed the expenditure and the associated requisition with Village Manager Mitchell, concerned that John Murtagh wished to send Murtagh Jr. to the training program so that he could interview for a job and that the expenditure was, thus, inappropriate. Mitchell dismissed Plaintiff's concerns and insisted that the requisition be approved, which Plaintiff did under protest. Village firefighters, including Captain Craig Sime ("Captain Sime"), subsequently informed Plaintiff that a job interview for Murtagh Jr. had indeed been arranged to coincide with this trip. Upon his return from training, Murtagh Jr. resigned from his job with the Village and moved to South Carolina.

      10.    <u>Improper Use of New Mexico Fire Protection Fund Proceeds</u>. In mid to late March 2021, then-current Village Fire Chief Kevin Henson ("Chief Henson") submitted a requisition for the purchase of 369 t-shirts from COPS of New Mexico Inc., d.b.a. TLC Uniforms at a cost of more than $6,000. Plaintiff questioned the purchase due to the number of shirts being purchased and the fact that the vendor's quote included children's t-shirt sizes. Chief Henson informed Plaintiff that the t-shirts were being purchased for a fundraiser. It turned out that the State Fire Protection Fund (Village Fund 209) was going to be used to fund the purchase. Plaintiff called the New Mexico State Fire Marshal's Office and spoke to Randy Varela, who manages the State Fire Protection Fund, for guidance on what types of purchases were permitted under fund and determined that the proposed purchase was not an authorized use of funds under New Mexico State Fire Marshal Division, Fire Service Support Bureau, Authorized Fire Fund Expenditures Policy, which specifically prohibits the use of State fire funds for the purchase of consumables in connection with local fundraisers. On the basis of this guidance, Plaintiff informed Chief Henson

and Mitchell that he would not be approving the requisition. On April 5, 2021, a new requisition was submitted for the same number of t-shirts. Unlike the original requisition, however, the vendor's quote included only adult sizes. Meanwhile, Captain Sime informed Plaintiff that the t-shirts would be placed in storage until such time as "folks forget how they were purchased," contradicting Chief Henson, who told Plaintiff that the t-shirts would be used for wildland fire crews—even though the Village did not have wildland fire crews at the time. On April 6, 2021, Plaintiff, on the basis of the guidance he received from the State Fire Marshal's Office and statements made by Chief Henson and Captain Sime, again objected to the purchase. Plaintiff spoke to Mitchell regarding the requisition. Mitchell assured Plaintiff that the t-shirts were no longer being purchased for a fundraiser and insisted that Plaintiff approve the requisition, which Plaintiff did under protest.

11.   <u>Lack of Valid Purchase Authorization – Solid Waste Department</u>. In January 2021, the Village Solid Waste Department sought to purchase a packer truck costing $281,934.00 and a curtain burner costing $128,277.40 from Buckner Truck and Air Burner Inc., respectively. The purchase was not included in the current budget and required competitive bidding and Village Council approval due to the purchase price, which exceeded the approval threshold of $60,000. When Mitchell presented the requisition for this equipment to Plaintiff, Plaintiff refused to provide his authorization, stating that the purchase was not budgeted and that the purchase had not been approved by the Village Council. Mitchell insisted that the purchase be authorized and had the Village Finance Director, Molli Grove ("Grove"), send Plaintiff an email stating that the Village had budgeted for the purchase when, in fact, it had not. Grove took the position that Plaintiff was authorized to approve the requisitions on the basis that (1) a purchase order was only required to order the equipment and would not facilitate payment, (2) the equipment would not be received

until FY22 such that it was not necessary for the funds to be allocated to the purchase in the current budget, and (3) the funds could simply be allocated to the purchase in the FY22 budget ahead of payment. Ultimately, Michell did not require the Solid Waste Department to obtain Village Council approval or to have the equipment added to the current budget (which itself is subject to Village Council approval) and instead insisted that Plaintiff approve the requisition, which Plaintiff did under protest. The Solid Waste Department completed the purchase of the packer truck and curtain burner on January 20, 2021, and January 21, 2021, respectively.

12.     Lack of Valid Purchase Authorization – Streets Department. In November 2020, the Village Streets Department purchased a 2020 International HX520/620 X15 truck from Roberts Truck Center at a purchase price of $161,798.42. Finance recorded the expense against a line item designated for "Other Contractual Services" rather than the line item designated for the purchase of vehicles, as "Other Contractual Services" was the only budget line item with funds available. Plaintiff approved the requisition under protest.

13.     Lack of Valid Purchase Authorization – Landscaping Services. In 2019, the Village eliminated the Maintenance Department, which had up to this point been responsible for maintaining the landscaping for the Village offices and the Village trails. At a meeting held on September 24, 2019, the Village Council approved the execution of a General Services Contract between the Village and Angel Fire Resort Operations, LLC ("Angel Fire Resort") for the purpose of procuring landscaping and beautification services. Angel Fire Resort's legal counsel prepared a draft of the proposed agreement and presented the draft to Village Procurement, with directions to complete the statement of work. Drafting was concluded, and the Village signed the agreement on September 24, 2019. The agreement was then sent to Angel Fire Resort's legal counsel for final review and signature, however, Angel Fire Resort raised certain questions regarding the scope and

the agreement was never signed. Meanwhile, in September and November 2019, despite the agreement not being signed and unbeknownst to the Village, Angel Fire Resort had a crew perform certain landscaping and trail maintenance. The Village first learned of the work when it received two invoices from Angel Fire Resort, dated December 3, 2019, in the amount of $3,904. The Village disputed the invoice, informing Angel Fire Resort that the invoice could not be paid since the agreement had not been signed. Angel Fire Resort disagreed and continued to send invoices to the Village. The issue resurfaced when the new Village administration took over in January 2020. Plaintiff explained the position of the previous administration and the fact that the work had been performed without a signed agreement. Mitchell disagreed and, against the insistence of Village Procurement, directed payment of the invoices under a requisition in the amount of $3,925.00 in or around August 2020, which Plaintiff approved under protest. The payments were subsequently flagged in the fiscal year 2020 audit by the Village accountant, Scott Eliason, however, Grove disagreed with the findings and directed Mr. Eliason to remove the findings.

14.   <u>Unlawful Employee Participation and Contemporaneous Employment</u>. In May 2021, Chief Henson submitted a requisition to purchase supplies from Bound Tree Medical LLC. Plaintiff was aware that Chief Henson was currently employed by Bound Tree Medical as a Sales Representative covering the region that includes the Village. As a result, when Chief Henson sought approval of the requisition from Plaintiff on May 18, 2021, Plaintiff took the requisition to Mitchell and stated that it could not be approved due to Chief Henson's affiliation with Bound Tree Medical and the fact that, as the region's sales representative, Chief Henson would receive a commission for the sale and thus personally benefit from the transaction. Mitchell directed Plaintiff to approve the requisition. When Plaintiff refused to do so, Mitchell told Plaintiff that it is "my budget" and that "I'll spend it any way I want to." Plaintiff persisted in refusing to approve the

requisition. Plaintiff then sent an email to Chief Henson explaining that the requisition had been denied. In justifying the denial, Plaintiff included a copy of the relevant portion of the New Mexico Government Conduct Code dealing with conflicts of interest. Chief Henson responded to Plaintiff in an email stating that, as of a certain date, he would no longer be employed by and representing Bound Tree Medical but that he could arrange an agreement between the Village and Bound Tree Medical for the purchase of medical supplies at a large discount. Plaintiff responded to Chief Henson stating that such an agreement was not possible given Chief Henson's recent affiliation with Bound Tree Medical and the appearance of impropriety due to the lack of arms-length pricing. Plaintiff again included the relevant portion of the New Mexico Government Conduct Code and asked Chief Henson to read it. On July 12, 2021, Chief Henson contacted Village legal counsel, Frank Coppler, who, on July 14, 2021, responded by saying that it was within Plaintiff's purview to deny the transaction. Upset by the turn of events, Chief Henson brought the issue to the interim Village Manager, Terry Cordova ("Cordova"). Cordova called a meeting between herself, Chief Henson and Plaintiff, during which Plaintiff repeated the legal basis for his objection to Chief Henson's proposed agreement between the Village and Bound Tree Medical. Cordova eventually agreed with Plaintiff and told Chief Henson that the Village would not be able to enter into an agreement with Bound Tree Medical at this time. Plaintiff stated that Chief Henson would need to be separated from Bound Tree Medical for at least one year before such an agreement would be possible.

15.     Failure to Comply with Notification, Training and Certification Requirements Relating to Chief Procurement Officers. Notwithstanding the training, certification and notification requirements of the Procurement Code at §§ 13-1-95.2 and 13-1-97(C), at an online budget meeting held in or around April 2021 for the review and approval of the FY22 budget,

Mitchell stated that, as Village Manager, he was the Chief Procurement Officer. In or around May 2021, a second online budget meeting was held, during which Mitchell acknowledged the training and certification requirements but stated, "we have that with Mr. Mascareñas, but I am the Chief Procurement Officer for the Village."

16.     <u>Failure to Adhere to Budgeting Process</u>. In early June 2021, the Finance Director, Grove, informed Plaintiff that she did not want to close "open" (i.e., purchase approved but not completed or invoiced) FY21 purchase orders by June 30, 2021—as required in conjunction with each fiscal year closing. Plaintiff objected to Grove's decision and told her that the closeout process must be followed at the end of each fiscal year and that any purchases covered by open purchase orders would require a new purchase order in FY22. Grove indicated that she did not agree with the process because it was too much work. Grove subsequently contacted the Village auditor, Scott Eliason CPA of Jaramillo Accounting Group, as well as Michael Steinenger of R.E.B. Management LLC to confirm the closeout process. They both told Grove (via email) that the closeout process, as described by Plaintiff, was indeed required and that this process is consistent with the fiscal year closeout process followed by all government entities. Grove emailed Plaintiff stating that she would concede but did not agree with the process. Grove closed the purchase orders in protest.

17.     <u>Falsification of Accounting Records</u>. In late 2020 to early 2021, Bennie Grine Janitorial Services ("Bennie Grine") was asked to provide the Village with a quote for cleaning services to be performed by Bennie Grine in connection with COVID-19 cleaning of the Village community center before and after upcoming vaccination clinics. Because Bennie Grine performs routine cleaning services for the Village under a Services Agreement dating from 2019, he was asked to separately quote the COVID-19 cleaning services. Requisitions were submitted and

approved prior to each vaccination clinic (four or five in total), resulting in the issuance of one purchase order for each clinic. When the invoices were received for each clinic, the Village Finance Department ignored the invoice dates and simply recorded the invoiced amount against a purchase order that covered the amount. Village Procurement identified several invoices that were matched and paid against purchase orders that were dated after the invoice date.

18.     Unauthorized Expenditures. The Village applied for a grant with Council approval to upgrade the Village recycling park. The grant was awarded in the amount of approximately $41,000. In or around September 2020, after the grant agreement had already been approved by the Village Council and signed, Mitchell determined that additional upgrades in the amount of $1,200 should be performed. Neither the increased scope of the project nor the increase in cost associated with these additional upgrades were approved by the Village Council. Against Plaintiff's objections, Mitchell insisted that the requisition be approved, which Plaintiff did under protest.

19.     Improper Forgiveness of Debt to Municipality. Mr. Warren Gallant, a Village resident and business owner, received an unusually large bill from the Village for water usage, which he believed to be the result of a faulty water meter. The Village replaced the water meter but the high water usage continued, indicating a potential leak on Gallant's side of the meter. Gallant insisted, however, that the replacement water meter was faulty as well. The Village replaced the water meter a second time, but the high water usage continued. Gallant continued to insist that the water meter was the cause of the problem. Gallant spoke to Mitchell, who had the Village Utility Department forgive the balance (now over $18,000) without Village Council approval.

20.     Conflict of Interest Transaction and Unauthorized Expenditures. In June 2021,

Resort Properties of Angel Fire ("Resort Properties") secured lodging for balloon pilots in connection with the Village's "Balloons Over Angel Fire" event, which took place June 18-20, 2021. Resort Properties is partially owned by Village Council member Owen Curry. After the event, Resort Properties submitted an invoice, totaling $8,951.60, to the Village for the cost of the lodging. Upon receiving the related requisition, Plaintiff informed Cordova and Mayor Mixon that the proposed transaction was prohibited by the Governmental Conduct Act and that Village could not pay the invoice as a result of the conflict of interest caused by Curry's partial ownership of Resort Properties and the benefit that Curry would be receiving as a result of the transaction. Curry stated that the proceeds of the invoice payment would go, not to him, but to the individual homeowners who rented their properties to the balloon pilots during the event. However, as Plaintiff explained to Mayor Mixon and Cordova, Curry would still receive an indirect benefit due to the fact that the homeowners would pay Resort Properties for the service it provides in finding renters. Mayor Mixon and Cordova disagreed and told Plaintiff that the invoice must be paid. On or about July 7, 2021, by directive of Mayor Mixon and Cordova and under protest, Plaintiff approved the requisition and the Village paid the invoice in the amount of $8,951.60. In addition, none of the purchases made by the Village in connection with "Balloons Over Angel Fire" were authorized (either by way of a credit card authorization or requisition and purchase order) in advance of the event. Instead, all of the purchases were approved after-the-fact in the amount of $11,457.24, inclusive of the cost of lodging.

21.     <u>Failure to Protect Against the Waste of Public Funds</u>. HDR Engineering, Inc. ("HDR") provided engineering services to the Village on an on-call basis in connection with various projects during the period 2016 to 2020. A portion of the cost of the work performed by HDR was to be allocated funding from 2017, 2018 and 2019 General Obligation Bonds.

Wastewater Treatment Plant Upgrade

22.     Wastewater Treatment Plant Upgrade.  The Village engaged HDR to produce a preliminary engineering report in connection with planned wastewater treatment plant upgrades, which are required to be completed by September 2022 in order to comply with certain New Mexico Environment Department regulations. Construction on the project is to be financed by funds received through the New Mexico Clean Water State Revolving Fund and a 2017 General Obligation Bond. HDR completed the preliminary engineering report and began the design phase of the project in or around 2017 with a completion deadline of 2019, but the design work remained unfinished as of August 31, 2021 (the date of Plaintiff resignation). As of August 31, 2021, the Village had failed to enforce HDR's performance obligations with respect to the design phase of the project, which has an estimated cost of $400,000 to $600,000.

Core Area Project – Preconstruction Issues

23.     The Village engaged HDR to perform engineering and design services in connection with the Core Area Project, an infrastructure and roadway improvement project that had a scheduled completion date of October 2019 ("Core Area Project"). HDR provided an estimate of the project cost to the Village, estimating that the Core Area Project would cost approximately $2,000,000, which amount was approved and allocated to the project. After completion of the design phase, and prior to the Village issuing a Request for Proposals, HDR increased its project cost estimate to $4,000,000. Despite initial reservations concerning the increase in estimated cost, the Village moved forward with the Request for Proposals and began reviewing contractor bids, one of which priced the project at over $8,000,000. HDR was unable to explain the cost discrepancy, as a result of which the Core Area Project was scaled down and bid out a second time. Bids with respect to this revised project scope continued to exceed the estimate

provided by HDR and the amount allocated to the project. The Core Area Project scope was reduced a third time and finally successfully bid to Northern Mountain Constructors ("Northern"). As of August 31, 2021 (the date of Plaintiff's resignation), the Village had failed to exercise its contractual rights available to it as a result of HDR's persistent cost miscalculations, design issues, delays and other construction oversight issues that have caused the Core Area Project to remain unfinished almost two years after its scheduled completion date.

Core Area Project – Construction Issues

24.     Northern began construction of the Core Area Project in or around the summer of 2019. Construction was suspended in October/November 2019 due to winter conditions, following which Northern sent a letter to the Village asking that the Village not assess liquidated damages against Northern as provided for under their agreement, claiming that the delays were the result of underground utilities not being relocated in a timely manner and engineering/design errors. Despite restarting in the summer of 2020, several issues identified during the winter suspension were never addressed. The project was again suspended in the winter of 2020. A walkthrough conducted by the engineer, HDR and Village staff, Plaintiff and Amos Torres, revealed several items that had not been completed or were in need of repair. Northern did not return to complete the project and make the necessary repairs in the summer of 2021 as planned. As of August 31, 2021 (the date of Plaintiff's resignation), and despite having spent thousands of dollars on the project over a three-year period, the Village had failed to resolve the dispute and, as far as Plaintiff is aware, the Core Area Project remains unfinished.

25.     Failure to Comply with Competitive Bidding Procedures and Contract Term Limits. The Village entered into professional services agreements with Caselle and ITEAM in 2015 in relation to software and IT services. In contravention of § 13-1-150 of the Procurement

15

Code, which limits the term of multi-year professional services contracts to four years (inclusive of all extensions and renewals), the agreements with Caselle and ITEAM were not rebid in 2019, as they should have been in accordance with the competitive bidding procedures set forth in the Procurement Code. Procurement Code at §§ 13-1-103 to 13-1-110 and § 13-1-150(B). In or around September 2020, Plaintiff brought the term issue to the attention of Grove, Cordova and Mitchell, who insisted that the four-year limit was inappropriate and that these services should be exempt from the requirement due to the cost of the change. Plaintiff urged them to reconsider their position on the basis of his interpretation of Procurement Code § 13-1-150(B). Plaintiff sought validation of his interpretation of Procurement Code § 13-1-150(B) from New Mexico General Services, who sent Plaintiff an email confirming that the agreements are not exempt from § 13-1-150(B) and stating that the Village must rebid the services or enter into an agreement with a vendor under the New Mexico State Price Agreement. Grove, Cordova and Mitchell continued to insist that the change of vendors was cost-prohibitive and, at least until August 31, 2021 (the date of Plaintiff resignation), refused to comply with the guidance received from New Mexico General Services. Although Caselle was replaced as the Village's software system and support provider by Tyler Technologies, Inc., dba InCode, there was no competitive bidding for the service, and no agreement had been executed with this replacement vendor as of August 31, 2021.

26.     Improper Use of Federal TAP Funds. In 2020, the Village commenced construction of a federally funded TAP project for the installation of sidewalks on NM 434 ("Sidewalk Project").

Lindsey and Trujillo Property

27.     It was discovered in October 2020 that two properties did not have NM Department of Transportation ("NMDOT") permitted driveway access and were thus not designated by

NMDOT to be included in the Sidewalk Project. As a result, a drive pad or driveway access for these two properties was not incorporated into the design plan for the Sidewalk Project. One of the property owners, B.J. Lindsey, contacted Mitchell to confirm that his property would be receiving a drive pad entrance. Mitchell facilitated its inclusion in the Sidewalk Project, by incorporating it into the design plan. At around the same time, neighboring property owners, Ernie and Irene Trujillo, who were unaware of the Sidewalk Project, discovered during a visit to the property that their driveway was now blocked by curb and gutter. The Trujillos contacted the Village engineer, Lawrence Ortega and Associates, and NMDOT to see what could be done to restore their driveway access. Despite having agreed to change design plans in order to accommodate the placement of a drive pad entrance at the Lindsey property, Mitchell informed the Trujillos that the Village would not accommodate the placement of a drive pad entrance for their property.

True Value Mountain Supply and Dollar General

28.     Two local business on NM 434 had installed concrete drive pad entrances for their properties after the design of the Sidewalk Project had been completed but prior to construction. The drive pads that were installed by True Value Mountain Supply and Dollar General did not comply with the Americans with Disabilities Act ("ADA") requirements for the Sidewalk Project. The Village, the engineer, Lawrence Ortega & Associates ("Ortega"), and NMDOT determined that True Value Mountain Supply would be required to remove, at its own expense, the existing drive pad to make way for the ADA-compliant sidewalk and drive pad. After complying and removing the existing drive pad, True Value Mountain Supply poured concrete to match the ADA-compliant sidewalk and drive pad. Shortly thereafter, a second business, Dollar General, was found to have the same issue as True Value Mountain Supply. After some delay, Village staff and Ortega contacted Dollar General management and began discussing the removal of the non-ADA-

compliant drive pad. Meanwhile, however, not wanting to delay the Sidewalk Project any longer, Mitchell instructed the project contractor, Abrahams, to move forward and indicated that the Village would incur the additional cost associated with removal of the Dollar General drive pad. Village Procurement approached Mitchell and objected to the fact that the Village had treated True Value Mountain Supply and Dollar General differently by requiring True Value Mountain Supply but not Dollar General to pay for the cost of the drive pad removal. Mitchell stated that they did not need to worry about the cost.

### C.    Plaintiff Raises Concerns and Initiates a Formal Investigation

29.    Plaintiff became increasingly incapable of performing in his role as the Chief Procurement Officer due to the aforementioned conflicts, suffered from high levels of stress and anxiety as a result of the persistent usurpation of his authority and the immense pressure placed upon him by Defendant and members of the Village's administration to ignore his ethical and legal obligations, and was subjected to a hostile work environment on almost a daily basis as a result.

30.    On June 23, 2021, Plaintiff met with Mayor Mixon and suggested to her that the Village should request an investigation through the New Mexico Office of the State Auditor ("OSA") in relation to the matters described in this Complaint. Sometime thereafter, Mayor Mixon filed the request.

31.    On July 20, 2021, Mayor Mixon informed Plaintiff that she had withdrawn the investigation request because it needed to be amended. Later that same day, Plaintiff contacted OSA and requested an investigation. It is not clear if Mayor Mixon's initial request was ever withdrawn or resubmitted to OSA.

32.    Pending completion of the requested investigation and out of concern for his own personal wellbeing, Plaintiff submitted a request for a leave of absence, which Mayor Mixon

subsequently denied.

33.     On or about July 21, 2021, OSA contacted the Village and spoke to Cordova, who subsequently approved Plaintiff's request for a leave of absence. Upon information and belief, Cordova also communicated to Mayor Mixon and members of the Village Council that Plaintiff was invoking his rights under the WPA.

34.     On August 24, 2021, Plaintiff was contacted by Cordova, who stated that OSA's investigation was complete and that it had revealed "misconduct but not fraud." Cordova then informed Plaintiff that he was required to return to work on August 26, 2021. Later that same day, Cordova called Plaintiff and left a voicemail stating that "measures" had been put in place to protect him against retaliation.

### D.     Defendants Retaliate

35.     From at least January 2020 through August 31, 2021 (the date of his resignation), as a direct result of his lawful efforts in attempting to enforce compliance with the Procurement Code and Governmental Conduct Act and protesting irregular, illegal and improper actions, including initiation by Plaintiff of an investigation by OSA, Plaintiff was the target of constant hostility, harassment and marginalization by the Village, to the point of even being overtly excluded from staff functions.

36.     Upon information and belief, in the spring of 2021, a number of Village management employees received a salary increase. Notwithstanding the approval of Plaintiff's salary increase (which was approved by Mitchell and Mayor Mixon due to the expansion of Plaintiff's responsibilities), Plaintiff never received his raise. Upon information and belief, the Village's failure to grant Plaintiff the approved raise was a direct result of his lawful efforts in attempting to enforce compliance with the Procurement Code and Governmental Conduct Act, and

initiation by Plaintiff of an investigation by OSA.

37.     Upon Plaintiff's return to work on August 26, 2021 (following his leave of absence), Cordova asked him to sign a document stating that he had been reinstated to return to work and was no longer on paid administrative leave. He asked for clarification as to what "measures" had been put in place to protect him against retaliation, and Cordova stated that he would need to talk to Mayor Mixon. He then asked for a copy of the report relating to OSA's investigation, and Cordova told him that he would need to talk to Mayor Mixon.

38.     On August 28, 2021, Plaintiff met with Mayor Mixon and Cordova. He asked Mayor Mixon for a copy of OSA's report. Mayor Mixon stated that:

    a.  the investigation had not revealed any wrongdoing and that she was upset with him because he had used the words "fraud, waste and abuse" during her administration;

    b.  they were going to keep the investigation open until November at which time the FY21 audit would be finished and that the report would be available at that time;

    c.  in relation to the protective "measures" that would be put in place, they were all going to work together and that they could watch each other in order to prevent retaliation;

    d.  Plaintiff would no longer be a supervisor;

    e.  Plaintiff would no longer manage the Grants and Projects Department and would, instead, be reassigned to work under the direction of Grove in the Finance Department;

    f.  Mayor Mixon would be rewriting the procurement policies and procedures to

ensure that procurement activities are conducted properly, which she said she would do on the basis that she is a "procurement expert";

g.  moving forward, she had given two departments the authorization to make emergency purchases and obtain services without an emergency declaration, and that Plaintiff would be required to take the appropriate steps to "correct" the procurement for those projects;

h.  Plaintiff was forbidden from communicating with the Village attorney or the Village's auditors;

i.  over the last year and a half, Mitchell had conducted a lot of business on his own without her knowledge and had created a hostile work environment for most, if not all of the Village staff, acknowledging that Plaintiff had been the focus of such hostility; and

j.  she was sorry for having placed him in this predicament.

39.    Whereas Plaintiff previously reported directly to Mitchell in his role as Chief Procurement Officer, Mayor Mixon made clear on August 28, 2021, that, effective immediately, Plaintiff would now be reporting to Grove, who (like Plaintiff up to this point) reported to the Village Manager. Though not characterized as such by Mayor Mixon, this transfer, the elimination of his supervisory authority and the restrictions placed upon him in relation to procurement activities constituted a demotion and a material change in the conditions of Plaintiff's employment within the spirit and letter of the Village Code, which provides in that "[A] demotion occurs when an employee is placed in a position with a lower salary," Section 2-3-5(A).

40.    Section 2-3-5(A) of the Village Code allows demotions if the employee's position "has been reclassified to a lower level," but no reclassification had occurred when Mayor Mixon

stripped Plaintiff of his supervisory and other responsibilities "effective immediately."

41.     Because Plaintiff's demotion was involuntary and punitive, Plaintiff was entitled to the due process protections contained in Village Code Section 2-9-7(D), which states: "[P]rior to any involuntary demotion . . . the affected employee shall be given a written notice of the contemplated action and the reasons for the contemplated action."  Village Code Section 2-9-7(B) also provides that "a pretermination hearing" is required "to permit the involved employee the opportunity to respond to any contemplated disciplinary action against him/her, with prior and sufficient notice of the contemplated action, which may result in the loss of monies to the employee, including:  demotion (unless voluntary) . . . ."

42.     Plaintiff was given no advanced notice of his involuntary demotion, no written reasons for the involuntary demotion and no pre-termination hearing before his demotion.

43.     As a result of this material change, out of continuing concern for his personal well-being, and because no reasonable person could be expected to endure the circumstances of his continuing employment, Plaintiff was forced to resign from his employment with the Village, effective August 31, 2021. Upon information and belief, Mayor Mixon's actions on behalf of the Village were a direct result of Plaintiff's lawful efforts in attempting to enforce compliance with the Procurement Code and Governmental Conduct Act, and initiation by Plaintiff of an investigation by OSA.

44.     On August 31, 2021, Counsel for Plaintiff contacted OSA and spoke with Shawn Beck, Director of the Special Investigation Division, who confirmed that one or more investigations concerning the Village had recently been requested but that none of them were complete. Mr. Beck was unable to provide further details due to confidentiality requirements.

45.

## CAUSES OF ACTION

## COUNT I. (VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT)

46.     Plaintiff incorporates by reference and re-alleges all of the allegations contained in ¶¶ 8-44, above.

47.     At all relevant times, Plaintiff was a "public employee" under § 10-16C-2(B) of the WPA.

48.     Defendant Village of Angel Fire is a "public employer" under § 10-16C-2(C)(2) of the WPA.

49.     Plaintiff believed in good faith that each instance of the Village's willful failure to comply with the Procurement Code and the Governmental Conduct Act in the acquisition of goods and services and the expenditure of public funds in connection with the transactions referenced in ¶¶ 9-44, above, constituted an "unlawful or improper act" under § 10-16C-2(E) of the WPA.

50.     As set forth above, Plaintiff made multiple lawful attempts to enforce the applicable statutory and regulatory requirements in order to prevent the aforementioned unlawful or improper acts, providing his approval for the transactions, in protest and under duress, only after delivering stern objections to the Village Manager, the Finance Director, Mayor Mixon and other Village administrators.

51.     Plaintiff raised concerns with Mayor Mixon and initiated an investigation through OSA in relation to the matters described in this Complaint.

52.     By virtue of the acts described above, the Village retaliated against Plaintiff by creating a hostile work environment for Plaintiff, took discriminatory or adverse employment actions against Plaintiff in the terms and conditions of his public employment, including a demotion and denying him a pay raise, and constructively discharged him from employment.

53.     Upon information and belief, the Village's actions, as alleged herein, were in retaliation for his lawful efforts in attempting to enforce compliance with the Procurement Code and Governmental Conduct Act, and for his initiation of an investigation by OSA, which constituted "retaliatory action" under § 10-16C-2(D) of the WPA.

54.     As a direct result of the Village's violation of the WPA, Plaintiff has suffered actual damages in the form of lost past and future wages, lost retirement benefits, and special damages, including damages for humiliation, mental anguish, loss of reputation and emotional distress.

55.     Therefore, pursuant to § 10-16C-4(A) of the WPA, Plaintiff is entitled to actual damages, reinstatement with the same seniority status that he would have had but for the violation, two times the amount of back pay with interest, compensation for special damages described above, litigation costs and reasonable attorney's fees.

56.     WHEREFORE, Plaintiff prays for judgment against the Village, for compensatory damages, including double lost wages and pre-judgment and post-judgment interest as allowed by law, reinstatement, and attorney's fees and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper.

**COUNT II. (VIOLATION OF FRAUD AGAINST TAXPAYERS ACT)**

56.     Plaintiff incorporates by reference and re-alleges all of the allegations contained in ¶¶ 8-44, above.

57.     NMSA 1978, Section 44-9-11B provides that an employer: "shall not discharge, demote, suspend, threaten, harass, deny promotion to or in any other manner discriminate against an employee in the terms and conditions of employment because of the lawful acts of the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a fraud against taxpayers action, including investigating, initiating,

testing or assisting in an action filed or to be filed . . . ."

58.     The actions taken by Plaintiff, as set forth above, clearly constitute disclosures to a government or law enforcement agency or actions taken in furthering a fraud against taxpayers action, within the meaning of NMSA 1978, Section 44-9-11B.

59.     The Village, through its administrators, knowingly harassed, created a hostile work environment for, denied a pay raise to, demoted and constructively discharged Plaintiff because of his lawful actions in making such disclosures or in furthering a fraud against taxpayers action.

60.     As a direct and proximate result of the actions and inactions of the Village, Plaintiff has suffered damages, as described more fully above. Pursuant to NMSA 1978, Section 44-9-11C, Plaintiff is entitled to all relief necessary to make him whole, including two times the amount of back pay with interest on the back pay, lost retirement benefits, compensation for emotional and mental distress, and other compensatory and special damages, including but not limited to loss of reputation.

61.     Plaintiff is also entitled to punitive damages against the Village based on its willful, wanton, malicious, bad faith conduct, and conduct in reckless disregard of his rights, to punish the Village and deter it and others from future acts of misconduct. Plaintiff is also entitled to recover his reasonable attorney's fees and litigation costs under FATA.

WHEREFORE, Plaintiff prays for judgment against the Village for compensatory and punitive damages, double lost wages, pre-judgment and post-judgment interest as allowed by law, and attorney's fees and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper.

### COUNT III. (VIOLATION OF 42 U.S.C. SECTION 1983)

62.     Plaintiff incorporates by reference and re-alleges all of the allegations contained in

¶¶ 8-44, above.

63.     At all material times, Mayor Mixon acted under color of state law, statute, ordinance, regulation, custom or usage.  Further, at all material times, Mayor Mixon was the highest ranking decision maker for the Village and as such, her actions constitute the official policy of the Village.

64.     As set forth above, the Village Code required that, prior to his involuntary demotion, Plaintiff be given written notice of the reasons for his proposed demotion and an opportunity to be heard.  These Village Code provisions established Plaintiff's legitimate and vested property interest in his employment as the Village Chief Procurement Officer of which he could not be deprived through his demotion without due process of law.

65.     At the time of Plaintiff's demotion, the contours of Plaintiff's vested property interest and constitutional right to due process were sufficiently clearly established that a reasonable public official would understand that the action she was taking in involuntarily demoting Plaintiff violated that right.

66.     Defendants' termination of Plaintiff's property interest in his job as Chief Procurement Officer by involuntarily demoting him without notice and an opportunity to be heard violates Plaintiff's right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

67.     Plaintiff is also entitled to punitive damages against Mayor Mixon based on her callous indifference towards and reckless disregard for Plaintiff's rights. Plaintiff is also entitled to recover his reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays for judgment against Defendants, for compensatory damages, punitive damages as allowed by law, pre-judgment and post-judgment interest as

allowed by law, and attorney's fees and expenses, all in an amount to be determined at trial, plus

such other and further relief as the Court deems just and proper.

> Respectfully submitted,
> By: */s/ Trevor T. Moore*
> Trevor T. Moore, Esq.
> P.O. Box 1592
> Angel Fire, New Mexico 87710
> (575) 595-1000
>
> HEMPHILL & MESSERER, P.C.
>
> By: */s/ Linda G. Hemphill*
> Linda G. Hemphill
> Leigh Messerer
> P.O. Box 33136
> Santa Fe, New Mexico 87594
> (505) 986-8515
>
> *Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on January 9, 2023, I caused the foregoing pleading to be filed through the Court's electronic filing system, which caused all of parties to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

> By: */s/ Linda G. Hemphill*
> Linda G. Hemphill

27